IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIANA AKOPYAN, as personal
representative of the ESTATE OF
DZHAAN DEMENTYEVA,

                Appellant,

      v.

CITY OF SHORELINE, a municipal
corporation or city,

                Respondent.

CITY OF SEATTLE, a municipal
corporation, and SEATTLE CITY
LIGHT, an electric utility owned and
operated by the CITY OF SEATTLE,

                Defendants.

No. 87668-6-I

DIVISION ONE

UNPUBLISHED OPINION

HAZELRIGG, C.J. — Diana Akopyan appeals from the trial court's order that granted the City of Shoreline's motion for summary judgment. The order dismissed the negligence claim she had filed on behalf of the Estate of Dzhaan Dementyeva, who was struck by a vehicle and killed while attempting to walk across a busy road mid-block after dark. Akopyan contends that the trial court erred because the City owed a duty to make pedestrian travel across the road safe. We disagree and affirm.

FACTS[1]

The parties do not contest that on "September 2, 2020 at approximately 8:30 p.m., Dzhaan Dementyeva was struck" by a vehicle, resulting in her death, "as she walked across Northwest Richmond Beach Road between 3rd Avenue Northwest and 8th Avenue Northwest" while attempting to cross mid-block in Shoreline. The place where Dementyeva crossed was "approximately 500 feet" from the nearest crosswalk, located at the intersection of Northwest Richmond Beach Road and 3rd Avenue. Her apartment was across the street from a "neighborhood shopping center" that included a grocery store, restaurants, a bank, and other businesses. Residents of Dementyeva's apartment building, and others nearby, routinely crossed Northwest Richmond Beach Road mid-block to access these locations. The City of Shoreline (the City or Shoreline) was aware that people had been injured while crossing in the same manner, another pedestrian had been killed in 2013, and neighbors had asked the City for many years to address the issue.

In September 2023, Diana Akopyan filed a complaint for damages against the City of Shoreline, the City of Seattle, and Seattle City Light in her capacity as the personal representative of the Dementyeva Estate.[2] Akopyan's complaint alleged that the City had failed to fulfill its duty to "exercise reasonable and ordinary

---

[1] Because we consider the evidence in the light most favorable to the nonmoving party and the parties do not contest the fact of the accident at issue, these undisputed facts are taken from the pleadings and supplemental materials before the trial court at summary judgment.

[2] A single clerk's minutes entry from a December 20, 2024 hearing suggests that Seattle City Light and its owner and operator, the City of Seattle, filed a motion to dismiss on summary judgment, distinct from the motion on appeal here. The clerk's minutes also indicate that the City of Seattle/Seattle City Light motion was granted at the conclusion of that hearing, and neither entity is party to the present appeal.

care and diligence in the ownership, design, establishment, construction, provision, installation, operation, management, inspection, monitoring, maintenance, control, repair, evaluation, and improve[ment]" of the area where the incident occurred so as to make it "reasonably safe for pedestrians, motorists, and others who use [it], specifically including Dzhaan Dementyeva." She argued that the City had breached this duty, "failed to exercise reasonable and ordinary care and diligence" by not ameliorating the risk pedestrians were exposed to, created the dangerous condition, it was reasonably foreseeable to the City that a pedestrian would be injured in this manner at this location, and "Dementyeva's injuries and death were proximately caused by the negligent failure of [the City]." In December 2023, the City filed an answer to Akopyan's complaint, offering numerous general denials and affirmative defenses, including discretionary immunity.

Nearly a year later, in November 2024, the City moved for summary judgment dismissal. The City claimed that it did not "owe any legal duty to maintain this roadway—outside a legal crosswalk—in a reasonably safe condition for pedestrians like Ms. Dementyeva." It contended that "the scope of a city's duty to maintain the area within the crosswalk is notably different than its duty to maintain the roadway outside of a crosswalk" and "Washington [c]ourts have repeatedly refused to impose a duty to maintain the entire roadway in a condition safe for pedestrian travel." It further averred that Akopyan could not "prove (or even allege) any uncommon or extraordinary road condition presenting a danger that cannot be reasonably anticipated by users" and the City's decision regarding any potential

safety improvements at the site of the incident were entitled to discretionary immunity.

The City's motion was supported by sworn declarations from counsel, an expert civil engineer, and the City's traffic engineer. The civil engineer expert opined that Dementyeva crossed Northwest Richmond Beach Road "in violation of Washington State law," 200 feet from existing streetlights, "no standard, state law or local ordinance" required "Shoreline to install a mid-block crosswalk on NW Richmond Beach Road," and the City had "developed an objective methodology to prioritize lighting improvements throughout the city and this section of roadway was not identified as being deficient." The declaration from the City's traffic engineer described the City's methods and processes for assessing and meeting its needs for roadway and streetlighting design, implementation, and maintenance, with corroborating exhibits.

Akopyan filed a response to the City's motion in December. She argued that "Shoreline had a duty to maintain and design Northwest Richmond Beach Road in a reasonably safe manner for ordinary travel" and a trier of fact should be able to consider the totality of the circumstances in its assessment of duty and decide whether crossing mid-block could amount to ordinary travel. (Boldface and capitalization omitted). Akopyan's response was supported by numerous exhibits including collision reports, reports from experts, and evidence of the City's decision-making process, governance, and awareness of the hazard. Broadly, these exhibits demonstrated the risks associated with this particular stretch of roadway in general, concerns of citizens regarding the risks to pedestrians who

chose to cross Northwest Richmond Beach Road mid-block, and the City's awareness of these issues.

The City filed a reply in support of its motion for summary judgment on December 13. Therein, the City reiterated its contentions that it did not owe Dementyeva a duty to maintain the roadway "in a reasonably safe condition for pedestrian traffic" or "to install a mid-block crosswalk" and that, even if the City did owe her a duty, the "roadway contained no extraordinary or unusual hazard triggering Shoreline's duty to repair or warn."

The trial court heard argument on the City's motion on December 20 during which the parties largely reiterated the contentions presented in their pleadings, and the court issued its ruling at the conclusion of the hearing. First, the trial court concluded,

> The City of Shoreline did not owe a duty to maintain the roadway, which was that part of the roadway outside and then the crosswalk[,] in a reasonably safe condition for pedestrians like the decedent. In addition to not owing a duty, even if there were a duty, there was no evidence of breach here.

It then explained that "there was no evidence of breach" because Akopyan had not offered proof of a "latent road hazard." The trial court granted the City's motion for summary judgment and entered an order to that effect.

Shortly thereafter, Akopyan filed a motion for reconsideration of the summary judgment order, supported by declarations from two residents of Dementyeva's apartment building and from counsel, which again included several exhibits. Among these exhibits were documentation of citizen comments on the safety issues of the roadway, the City's streetlight plan, and a variety of industry

and government authored literature about designing safe roads.[3]  The trial court denied the motion on January 3, 2025.

Akopyan timely appealed.[4]

ANALYSIS

I.    Summary Judgment

CR 56 governs summary judgment.   The trial court will grant summary judgment if the evidence presented shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  CR 56(c).  We review a trial court's order on summary judgment de novo and engage in the same analysis as the trial court.  *Berry v. King County*, 19 Wn. App. 2d 583, 587, 501 P.3d 150 (2021).  The party who moves for summary judgment has the burden to show "that there are no genuine issues of material fact."  *Pac. Nw. Shooting Park Ass'n v. City of Sequim*, 158 Wn.2d 342, 350, 144 P.3d 276 (2006).  A genuine issue of material fact exists "if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party."  *Keck*

---

[3] The exhibits appended to counsel's declaration included citizen comments, Shoreline's 2018 "Street Light Master Plan," an excerpt from the "Guide for the Planning Design and Operation of Pedestrian Facilities" published by the American Association of State Highway and Transportation Officials, an excerpt from "A Policy on Geometric Design of Highways and Streets," also published by that Association, an excerpt from the "Manual on Uniform Traffic Control Devices" published by the United States Department of Transportation, and a Court of Appeals commissioner's ruling from another case.

[4] The City's response brief in this appeal contended, in part, that summary judgment was proper because the City had discretionary immunity.  Akopyan then filed a motion requesting leave to file an overlength reply brief on the basis that the City "raised new claims and arguments" on discretionary immunity in its briefing.

The City filed a response in opposition that asserted, with citations to the record, it had raised discretionary immunity in the trial court and it was therefore a proper subject for its briefing on appeal.  Unsolicited, Akopyan filed a reply to her motion.  A notation ruling was entered on December 8, 2025 at the direction of this panel that denied Akopyan's motion and authorized only a brief that complied with the RAPs.

*v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). "A party may move for summary judgment by setting out its own version of the facts or by alleging that the nonmoving party failed to present sufficient evidence to support its case." *Pac. Nw. Shooting Park*, 158 Wn.2d at 350. "Once the moving party has met its burden, the burden shifts to the nonmoving party to present admissible evidence demonstrating a genuine issue of material fact." *Id.* at 351. We consider "'the evidence and all reasonable inferences from the evidence in the light most favorable to the nonmoving party.'" *Galassi v. Lowe's Home Ctrs., LLC*, 4 Wn.3d 425, 434, 565 P.3d 116 (2025) (quoting *Keck*, 184 Wn.2d at 370).

Akopyan, as plaintiff, had the burden of proving each element of her negligence claim at trial. "In order to recover on a common law claim of negligence, a plaintiff 'must show (1) the existence of a duty to the plaintiff, (2) a breach of that duty, (3) a resulting injury, and (4) the breach as the proximate cause of the injury.'" *Lowman v. Wilbur*, 178 Wn.2d 165, 169, 309 P.3d 387 (2013) (quoting *Crowe v. Gaston*, 134 Wn.2d 509, 514, 951 P.2d 1118 (1998)). "The issues of negligence and proximate cause are generally not susceptible to summary judgment. However, 'when reasonable minds could reach but one conclusion, questions of fact may be determined as a matter of law.'" *Ruff v. County of King*, 125 Wn.2d 697, 703-04, 887 P.2d 886 (1995) (citations omitted) (quoting *Hartley v. State,* 103 Wn.2d 768, 775, 698 P.2d 77 (1985)). If "'the plaintiff fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,'" then the trial judge should grant summary judgment. *Berry*, 19 Wn. App. 2d at 587 (internal quotation

marks omitted) (quoting *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989)).

A.      Duty of Care

Akopyan contends that "Shoreline was not entitled to summary judgment, and a reasonable jury could have concluded Shoreline owed and breached a duty and pedestrian travel here was 'ordinary travel.'" The City avers that because "no legal duty was owed to maintain this portion of NW Richmond Beach Rd. safe for crossing pedestrians, this [c]ourt should affirm summary judgment." We agree with the City.

The existence of a duty is a question of law we review de novo. *Zorchenko v. City of Federal Way*, 31 Wn. App. 2d 390, 394, 549 P.3d 743, *review denied,* 3 Wn.3d 1026 (2024). "Government entities are held to the same negligence standards as private individuals." *Nguyen v. City of Seattle*, 179 Wn. App. 155, 164, 317 P.3d 518 (2014). We necessarily consider "the questions 'to whom the duty is owed, and what is the nature of the duty owed,' which define the scope of the municipality's duty." *Chen v. City of Seattle*, 153 Wn. App. 890, 900, 223 P.3d 1230 (2009) (quoting *Keller v. City of Spokane*, 146 Wn.2d 237, 243, 44 P.3d 845 (2002)). Our Supreme Court has held "that a municipality owes a duty to all persons, whether negligent or fault-free, to build and maintain its roadways in a condition that is reasonably safe for ordinary travel." *Keller*, 146 Wn.2d at 249. This duty includes safeguarding "against inherently dangerous or misleading condition[s]." *Owen v. Burlington N. Santa Fe R.R. Co.*, 153 Wn.2d 780, 787-88, 108 P.3d 1220 (2005). To determine "'whether or not a municipality has exercised

reasonable care,'" we "'must in each case necessarily depend upon the surrounding circumstances.'" *Chen*, 153 Wn. App. at 902 (quoting *Berglund v. Spokane County*, 4 Wn.2d 309, 315-16, 103 P.2d 355 (1940)).

"By establishing certain presumptions in their favor, the law directs pedestrians to use marked crosswalks. Therefore, the city has a corresponding duty to maintain its crosswalks in a manner that is reasonably safe for ordinary travel in light of the circumstances at each particular crosswalk." *Id.*at 906-07; *see also* RCW 46.61.235 (drivers must yield to those using a crosswalk). But our Supreme Court and Division One of this court have held that once a pedestrian has left the protection of a crosswalk, a municipality has no duty to those who cross to ensure that the road is safe for that unauthorized purpose. *Hansen v. Wash. Nat. Gas Co.*, 95 Wn.2d 773, 778, 632 P.2d 504 (1981); *see also Perez v. City of Seattle*, No. 85831-9-I (July 22, 2024) (unpublished), https://www.courts.wa.gov/opinions/pdf/858319.pdf; *Woolcott v. City of Seattle,* No. 73514-4-I (May 23, 2016) (unpublished), https://www.courts.wa.gov/opinions/pdf/735144.pdf.[5]

In support of its motion, the City offered authority that established the proposition that "Washington [c]ourts have repeatedly refused to impose a duty to maintain the entire roadway in a condition safe for pedestrian travel," citing *Hansen*, *Nelson v. City of Tacoma*, 19 Wn. App. 807, 577 P.2d 986 (1978), and *Coleman v. Altman*, 7 Wn. App. 80, 497 P.2d 1338 (1972). It also provided other case law to dispute Akopyan's contentions regarding the nature of ordinary travel

---

[5] Under GR 14.1, we may cite to unpublished opinions as necessary for well-reasoned opinions. *Perez* and *Woolcott* are cited here to illustrate a consistent pattern of holdings in the opinions of this court, each of which has involved consideration of similar legal issues and underlying facts and because they were relied on in the trial court.

for pedestrians. "Shoreline's position [is] that pedestrian use outside of a crosswalk does not constitute ordinary travel." The City again relied on *Hansen,* in addition to *Woolcott, Perez*, and *McKee v. City of Edmonds*, 54 Wn. App. 265, 773 P.2d 434 (1989), which together, supported the latter stance. Akopyan's response to the City's motion relied on evidence that the City was aware that it was routine for people to cross mid-block, knew that this was dangerous, and had a duty to ensure the safety of pedestrians who moved in this way because this was a regular practice such that these pedestrians were engaged in "ordinary travel."

Even viewing these facts in the light most favorable to her, Akopyan failed to provide legal authority to support her conclusion that knowledge of routine unauthorized crossing by pedestrians[6] can amount to ordinary travel, which then triggers a duty for a City to make an unauthorized crossing reasonably safe. Akopyan asserted that the cases relied on by the City were only persuasive authority, as to *Perez* and *Woolcott*, or the other "cases hinged on the idea that it *might* be foreseeable someone could possibly step outside of the sidewalk, and the court declined to extend a city's duty under such speculative circumstances," a fact she claimed was absent here given the City's knowledge of the routine unauthorized crossing on Northwest Richmond Beach Road.

_____

[6] The parties frequently used the word "jaywalking" to refer to this conduct, both in the trial court and on appeal. Because that term is rooted in classist stereotypes regarding intelligence traceable to the early days of private vehicle travel in this country, we decline to use it.

The word "originates from 'jay,' a term for a naive or out-of-place rural person. . . . In this context, calling a pedestrian 'a jaywalker' would imply, 'you are stupid for walking in an unsafe way across the street,' but in a pejorative way." Guy Seidman, Aviv Gaon, *The Mystery of the "Free" Open Road*, 52 FORDHAM URB. L.J. 623, 681 n.353 (2025) (quoting PETER D. NORTON, FIGHTING TRAFFIC: THE DAWN OF THE MOTOR AGE IN THE AMERICAN CITY 71-79 (2008)). Notably, it first gained popularity as "a central tool in reshaping road use, with public safety campaigns promoting it to define proper pedestrian behavior." *Id.* at 681.

Akopyan is incorrect; our state's highest court has plainly and repeatedly held that there is no such duty. Nearly 90 years ago, in *Berglund*, our Supreme Court held that the county owed a duty to a pedestrian who was injured when she was struck by an automobile while crossing a county bridge on foot. 4 Wn.2d at 312, 317. Crucial to this holding was the fact that the bridge was the *only* way to cross the river; the court determined that the county had invited pedestrians to use the bridge, and thus, the county had a duty to ensure the safety of pedestrians who did so. *Id.* at 316-17. Here, Akopyan never contended that crossing mid-block was the *only* way for pedestrians to cross Northwest Redmond Beach Road, just that the existing crosswalks were several hundred feet away, and, critically, did not provide evidence to support an inference that the City had invited people to cross mid-block such that a duty was triggered as in *Berglund*.

Our Supreme Court returned to the duty municipalities owe to those using its roadways in *Keller*. There, Keller was injured when the motorcycle he was operating collided with a car. *Keller,* 146 Wn.2d at 240. Keller sued the driver of that other vehicle and the City of Spokane. *Id.* The Supreme Court held that the jury instruction that had been given regarding the City of Spokane's duty to Keller was "misleading and legally erroneous because it allowed the jury to conclude that the City owed Keller no duty if it found that Keller had acted negligently."[7] *Id.* at

---

[7] Keller, joined by amicus curiae Washington State Trial Lawyers Association Foundation (WSTLA Foundation), had proposed a revision to Washington Pattern Jury Instructions: Civil 140.01, the instruction at issue in that case. *Keller*, 146 Wn.2d at 253. They urged the Supreme Court to remove "the word 'ordinary' as a modifier for the term 'travel.' WSTLA Foundation argue[d] that 'ordinary' may lead to the jury to deny recovery if, for example, it finds a motorist negligent conduct extraordinary." *Id.* However, our Supreme Court rejected the proposed change to the pattern instruction. *Id.* at 254. It explained that removing the "the modifier 'ordinary' from travel . . . would seem to change the scope of the duty." *Id.*

WSTLA changed its name to the Washington State Association for Justice in 2008.

239. The court held that the City of Spokane owed a duty "to all persons, whether negligent or fault-free, to build and maintain its roadways in a condition that is reasonably safe for ordinary travel." *Id.* at 249. This holding corrected a line of cases after *Berglund* that had interpreted it as limiting the scope of a municipality's duty "to only those using the road and highways in a nonnegligent manner." *Id*. at 250-51. Here, the City's summary judgment motion did not hinge on any claims regarding Dementyeva's own negligence but emphasized the limited scope of the duty it owes to pedestrians.

Several years after *Keller*, this court took up the question of a municipality's duty to pedestrians in *Chen*. Chen's husband, Liu, was struck and killed by a vehicle while crossing within the bounds of a crosswalk. *Chen,* 153 Wn. App. at 894. We held that because the "law directs pedestrians to use marked crosswalks," it followed that "the city has a corresponding duty to maintain its crosswalks in a manner that is reasonably safe for ordinary travel." *Id.* at 906-07. Critically, we also noted that the municipality's duty to make passage safe for pedestrians was triggered when it decided to open the crosswalk for pedestrians, an act that establishes the crosswalk as the course for ordinary travel. *Id.* at 907.

Between the issuance of the *Berglund* and *Keller* opinions*,* and subsequently, our Supreme Court has continued to hold that the duty owed by the State or municipalities is to those engaged in ordinary travel on its roads. *See, e.g., Parker v. Skagit County*, 49 Wn.2d 33, 40, 297 P.2d 620 (1956); *McCluskey v. Handorff-Sherman*, 125 Wn.2d 1, 6, 882 P.2d 157 (1994); *Wuthrich v. King County*, 185 Wn.2d 19, 25, 366 P.3d 926 (2016)*.* As an intermediate appellate

court bound to follow the controlling authority of our Supreme Court, this court has also repeatedly so held, well beyond the two unpublished cases offered by the City. *See, e.g., Unger v. Cauchon*, 118 Wn. App. 165, 176, 73 P.3d 1005 (2003); *Fite v. Mudd*, 19 Wn. App. 2d 917, 931-32, 498 P.3d. 538 (2021).[8]

In the two unpublished opinions on which the City relies here, we reiterated the scope of this duty as it pertains to pedestrians. In *Perez*, the pedestrian "did not dispute that she crossed outside the limits of the unmarked crosswalk," but still argued "that the area where she was walking at the time of her fall 'was a foreseeable pedestrian path which was adjacent to a dangerous condition.'" No. 85831-9-I, slip op. at 4. We held that because Perez crossed outside of the unmarked crosswalk, "the City had no duty to ensure the area was safe for her," the area at issue was not "for pedestrian use," Perez had not been invited to use it, and our Supreme Court "had declined to broaden the City's duty include 'to all foreseeable travelers.'" *Id.* at 6-7 (quoting *Hansen*, 95 Wn.2d at 777). In *Woolcott*, the plaintiff was injured when he stepped into a pothole that was "toward the middle of the intersection" and outside of the marked crosswalk. No. 87514-4-I, slip op. at 1-2. There, we held that the "intended use of the street" had to be considered. *Id.* at 4. This was so because "'[t]he law directs pedestrians to use marked crosswalks'" and the City had to "ensure that crosswalks are safe for pedestrians," but, relying on long-established precedent, we expressly held that the City had "no

---

[8] We separately note that this court recently reviewed this authority and reiterated this rule in an unpublished opinion, *Brende v. City of Seattle*, but, consistent with our holding in the instant case, determined that because the "only route for Brende to access the driver's side of her legally parked car was the roadway," the City of Seattle's "invitation to drivers to use the roadway to access the driver's side of their parked cars carries with it a corresponding duty to keep that area in a reasonably safe condition for that intended use." No. 87659-7-I, slip op. at 6-7 (Jan. 12, 2026) (unpublished), https://www.courts.wa.gov/opinions/pdf/876597.pdf.

duty to ensure pedestrians can safely cross the street where there is no crosswalk." *Id.* at 4 (quoting *Chen*, 153 Wn. App. at 906). We again followed *McKee* to reject Woolcott's contention that foreseeability created a duty for the City in addition to *Hansen* for "the principle that the scope of the duty" had to be "defined by the availability of unobstructed, marked crosswalks." *Id.* at 5-6.

Here, the City did not open the area where Dementyeva chose to cross for pedestrian use by creating a marked or unmarked crosswalk, nor did it invite her to use Northwest Richmond Beach Road in this manner by making the spot where she was struck the only place to cross the road. *See Bergland*, 4 Wn.2d at 316-17; *Chen*, 153 Wn. App. at 906-07. The acts held to constitute the establishment of patterns and places for the ordinary travel of pedestrians are not present here. Absent a crosswalk or other such invitation for ordinary pedestrian travel and an accompanying duty for the municipality, we do not consider foreseeability when defining the duty a City owes to pedestrians outside the confines of a crosswalk. *See Hansen*, 95 Wn.2d at 777; *Nelson*, 19 Wn. App. at 810-11. Instead, we follow the precedent from our Supreme Court in *Hansen*; municipalities do not owe a duty to pedestrians who choose to cross mid-block, eschewing an available crosswalk. 95 Wn.2d at 778. Thus, without legal authority to rebut the cases put forward by the City, Akopyan failed to raise a genuine issue of material fact as to the question of any duty that the City owed to Dementyeva, despite the unfortunate circumstances of her death.

Because the trial court correctly concluded that the City owed no duty here, an essential element of a negligence claim, we affirm summary judgment dismissal.

WE CONCUR:

Díaz, J.

Chung, J.